1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

| THE BOARD OF TRUSTEES FOR THE ALASKA CARPENTERS DEFINED CONTRIBUTION TRUST FUND, | CASE NO. 22-cv-01337 |
|---|---|
| | ORDER ON MOTION TO DISMISS |
| Plaintiff, | |
| v. | |
| PRINCIPAL LIFE INSURANCE CO., an Iowa Company, | |
| Defendant. | |

8
9
10
11
12
13
14

## 1. INTRODUCTION

15

This is an ERISA case. Plaintiff The Board of Trustees for the Alaska

16

Carpenters Defined Contribution Trust Fund ("The Board") sues Defendant

17

Principal Life Insurance Co. ("Principal Life"), alleging Principal Life breached its

18

fiduciary duties and contract with the Board as the plan's former administrator.

19

Dkt. No. 1. Principal Life moves to dismiss the complaint arguing the Board fails to

20

state a claim. Dkt. No. 14. The Court disagrees and DENIES the motion as

21

explained further below.

22
23

1

## 2. BACKGROUND

2

3

The facts below are taken from the Board's complaint, which the Court

accepts as true on review of Principal Life's Rule 12(b)(6) motion. *Bafford v.*

4

*Northrop Grumman Corp.*, 994 F.3d 1020, 1024 (9th Cir. 2021) (citing *Curtis v.*

5

*Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019)).

6

The Alaska Carpenters Defined Contribution Trust Fund ("Trust") is a trust

7

fund that sponsors a multi-employer individual account or defined contribution

8

plans for carpenters and their families. Dkt. No. 1 ¶ 1.1. The Board administers the

9

Trust as its named fiduciary. *Id.* The Board consists of ten unpaid volunteers, and

10

the Trust has no employees, so the Trust contracts with third-party administrators

11

for its day-to-day operations like receipt of contributions, confirmation of

12

contributions, enrollment and eligibility determinations, beneficiary record

13

maintenance, financial accounting, and assistance with distributions. *Id.* ¶¶ 3.1–

14

3.2.

15

16

17

18

19

20

21

22

23

ORDER ON MOTION TO DISMISS - 2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

        In 2011, the Trust entered a Master Services Agreement with Wells Fargo

Bank, N.A. for recordkeeping and administrative services, including recordkeeping

of participant accounts, asset custody, trust fund reporting, processing

distributions, and distribution of certain participant notices. *Id.* ¶ 3.3. The Board

did not attach the Master Services Agreement to its Complaint. But it alleges that

under the agreement, Wells Fargo would receive an annual fee of $55.00 per

participant account, billed to the Board monthly. *Id.* ¶ 3.4. If the plan's investment

managers paid the plan revenue sharing amounts, those amounts were to be

deposited to a reserve account and used "pursuant to written direction to Wells

Fargo." *Id.*

        The Trust and Wells Fargo amended the Master Services Agreement several

times, including in 2014, 2015, 2020, and 2021. *Id.* ¶¶ 3.5–3.7. The amendments all

dealt with how fees would be calculated and paid to Wells Fargo. In 2014, the Trust

and Wells Fargo amended the Master Services Agreement "to add an asset-based

fee between 10 basis points and 35 basis points to cover" various costs, including the

Trust's third-party administrator, attorney, auditor, investment consultant,

insurance, and "other plan-related expenses." Dkt. No. 1 ¶ 3.5. Like the "revenue

sharing amounts," "the asset-based fee was to be paid to a reserve account and

subsequently used to pay qualified plan expenses pursuant to written direction to

Wells Fargo." *Id.*

        The Trust and Wells Fargo amended the Master Services Agreement again in

January 2015. This time to change the "asset-based fee to a flat 20 basis point fee

(inclusive of revenue sharing) . . . ." *Id.* ¶ 3.6. Additionally, Wells Fargo agreed "to

create a separate reserve account for the revenue sharing amounts and directed that the asset-based fee be paid to this reserve account." *Id.* The "fees and expenses described in the amendment 'constitute[d] amounts payable to Wells Fargo Bank.'" *Id.* Despite repeated references in the Master Service Agreement and its various amendments to amounts payable to Wells Fargo, "the understanding and practice between the parties was that the asset-based fee was designated solely to pay plan expenses, other than Wells Fargo's fee." *Id.* In other words, the Board alleges, at no time did Wells Fargo pay itself the asset-based fee.

Effective January 2020, the Trust and Wells Fargo amended the Master Services Agreement yet again. *Id.* ¶ 3.7 This amendment reduced the asset-based fee to 15 basis points and the account fee from $55 to $50 per participant. *Id.* "[T]he practice regarding the allocation and use of the asset-based fee remained unchanged" otherwise. *Id.*

In the meanwhile, Principal Life bought Wells Fargo's recordkeeping business in May 2019. At the time, Wells Fargo's Client Relationship Manager, Mark Thomas, informed the Board that the Trust "would be transitioning" to Principal Life and that Wells Fargo's fees would not change. *Id.* at ¶ 3.9. In February 2020, Thomas sent a written request to the Fund for its consent to assign "its Wells Fargo agreement to Principal." *Id.* Thomas stated, "***Except as specifically stated otherwise in the Consent, all terms and conditions of the Agreements, including amounts charge [sic] for any services, will remain the same at the time of the transfer to Principal***." *Id.* (emphasis in complaint).

About a year later, Thomas emailed the Trust's attorney, Frank Morales, about updating Wells Fargo's fee schedule for "AK Carpenters" and "chang[ing] the administrative procedures to combine the expense accounts" for the move to Principal Life. *Id.* ¶ 3.10. Thomas included "an agreement" with his email that did not include the "reserve account," but "the remaining language in the agreement was largely unchanged." *Id.*

Thomas and Morales also spoke on the telephone that day, with Thomas telling Morales that "Principal preferred to credit the revenue sharing amounts directly back to participant accounts rather than use them to offset plan expenses . . . [and] if the revenue sharing amount were paid back to plan participants there was no need to reference the reserve account in the agreement." *Id.* ¶ 3.11. The Board further alleges that Thomas assured Morales "that proposed fee changes consisted solely of change to the revenue sharing and that the fees payable to Wells Fargo and to Principal, by assignment, were not increasing." *Id.* ¶ 3.11.

On May 20, 2021, Morales provided the Board with the "requested amendment to the fee schedule." *Id.* ¶ 3.12. The Board contends Morales "conveyed the information that Thomas told him, namely 'This agreement is to clean-up some items in anticipation of the transition to Principal. The fees are not changing, other than that the rebates will no longer be used to pay for any administrative expenses.'" *Id.* Thomas did not inform the Trust or its advisors that Wells Fargo was increasing its fees. *Id.* ¶ 3.13.

The Trust went "live" on Principal Life's system on May 25, 2021, but the system immediately began to have "significant problems," including failure to

1
2
3
4
5

timely and correctly deposit contributions into participant accounts, failure to

provide requested information on how the contribution correction was made or

funded, failure to attend Board meetings or provide timely responses to the Trust's

"numerous questions and concerns," and failure to provide the Board information it

needed "to complete its required annual audits." *Id.* ¶ 3.14(a)-(h).

6
7
8
9
10
11
12
13
14
15
16
17
18
19

      Ultimately, the Board terminated Principal's services on May 1, 2022. *Id.* at

¶ 3.15. The Trust's new recordkeeper, Milliman, informed the Trust that Principal

had transferred the Trust's reserve account in the amount of $300,000 to "the Trust

Fund's new custodial bank." *Id.* ¶ 3.16. This amount was "significantly less than

expected," since the reserve account was previously reported to be around $800,000.

*Id.* In response to the Trust's inquiry about the balance, Principal Life said it had

not been paid its fees since May 2021, so it "'pulled fees owed at termination and

collected all fees owed to date.'" *Id.* ¶ 3.17 (quotation unattributed). Principal Life

provided Trust invoices on June 6, 2022, and itemized invoices on August 12, 2022.

*Id.* The Board alleges that "Principal paid to itself not only the $50 per participant

per account annual fee, but also the 15 basis point asset fee . . . Despite assurance

that the fees would not change as a result of the transaction, the additional 15 basis

point asset fee more than doubled the recordkeeping fee payable to Wells Fargo . . ."

*Id.* ¶ 3.18.

20
21
22
23

1

2

3

## 3. ANALYSIS

**3.1.    Legal standards.**

### 3.1.1.    Motion to dismiss standard.

The Court will grant a motion to dismiss only if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The plausibility standard is less than probability, "but it asks for more than a sheer possibility" that a defendant did something wrong. *Id.* (citations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly,* 550 U.S. at 557). In other words, a plaintiff must have pled "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

When considering a motion to dismiss, the Court accepts factual allegations pled in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). But courts "do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citations omitted). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.* (internal quotation marks omitted).

### 3.1.2.   Incorporation by reference.

The Court's review of the record is typically confined to the contents of the complaint when considering a Rule 12(b)(6) motion. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). But courts may look beyond the pleadings and consider documents referenced extensively in the complaint or that form the basis of the plaintiff's claim when deciding whether the allegations in the complaint state a claim upon which relief can be granted. *United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).

The Board extensively references the Master Services Agreement and its various amendments throughout its complaint. The Board did not attach the contract documents to its complaint, but Principal Life has submitted copies of the Master Services Agreement, the Wells Fargo Schedule of Services, and the 2021 Amendment to the Services Agreement in support of its motion. Dkt. No. 15. The Board does not challenge whether these documents are true and accurate, whether they are complete, or whether the Court may consider them on review of Principal Life's Rule 12(b)(6) motion without converting the matter to a Rule 56 motion. To the contrary, the Board references them in its opposition brief and uses them to support its breach of contract argument. Dkt. No. 16 at 10–11. Thus, the Court will consider the Master Services Agreement and 2021 Amendment under the doctrine of incorporation by reference.

The Court will not, however, incorporate the May 10, 2021, email from Thomas to Wells Fargo, as Principal Life requests. The Board neither references this email extensively nor relies on it as the basis of a claim. "[T]he mere mention of

the existence of a document is insufficient to incorporate the contents of a

document." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). The

Ninth Circuit has warned that the incorporation "doctrine is not a tool for

defendants to short-circuit the resolution of a well-pleaded claim" and "[s]ubmitting

documents not mentioned in the complaint to create a defense is nothing more than

another way of disputing the factual allegations in the complaint." *Khoja v.*

*Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

Along the same lines, the Court declines to consider the late-breaking factual

developments submitted by the parties about the status of the Fund's financial

audits. *See* Dkt. Nos. 17, 19, 21, 21-1. "In deciding a motion to dismiss, courts may

not 'take into account additional facts asserted in a memorandum opposing the

motion to dismiss, because such memoranda do not constitute pleadings under Rule

7(a).'" *In re Turbodyne Techs., Inc. Sec. Litig.*, CV9900697MMMBQRX, 2000 WL

33961193, at *10 (C.D. Cal. Mar. 15, 2000) (citing *Schneider v. California Dept. of*

*Corr.*, 151 F.3d 1194, 1197, n. 1 (9th Cir.1998) (quoting 2 J. Moore et al., Moore's

Federal Practice, § 12.34[2] (3d ed.1997))).

### 3.2.  The Board has plausibly alleged that Principal Life was an ERISA fiduciary.

The Board alleges that Principal Life was an ERISA fiduciary and that it

breached its duty owed to the Trust in several respects. Principal Life says it never

acted as a fiduciary "when taking the action subject to the complaint" and that, as a

result, the Board fails to state a plausible claim for relief. Dkt. No. 14 at 7.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ERISA imposes fiduciary duties on those responsible for managing retirement plans. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). "To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that (1) the defendant was a fiduciary; and (2) the defendant breached a fiduciary duty; and (3) the plaintiff suffered damages." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir. 2021). A party may be a "named fiduciary" under 29 U.S.C. § 1102(a), or a "functional" fiduciary if the party "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . ." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653 (9th Cir. 2019) (citing 29 U.S.C. § 1002(21)(A)). "The Supreme Court has stressed that the central inquiry is whether the party was acting as an ERISA fiduciary 'when taking the action subject to complaint.'" *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).

Principal life does not challenge whether the Board plausibly alleged a breach of a fiduciary duty or damages suffered because of the breach. Instead, Principal Life's motion focuses solely on whether it was an ERISA fiduciary in the first place. So, the Court's inquiry is limited to whether the Board has plausibly alleged that Principal Life was an ERISA fiduciary at the time of its actions that are the subject of the complaint.

The Board alleges Principal Life was an ERISA fiduciary because it used its control and discretion to withdraw fees from fund assets beyond any previously agreed amounts, without warning, and without submitting invoices showing or

explaining the fees billed.[1] Dkt. No. 1 ¶ 4.4. Ordinarily, a service provider is not "acting as a fiduciary when withdrawing precise, preset fees from the pooled accounts," but the Board's allegations align with the Ninth Circuit's observations in *Santomenno,* that plaintiffs who allege that a service provider "withdrew more than it was entitled to" may plausibly allege a fiduciary relationship. 882 F.3d at 838, 840–841. So, the Board's allegations that Principal Life had control over fund assets, and that it used its discretion to unilaterally withdraw fees inconsistent with the "understanding and practice" involving fees and representations made to the Board about the same, will suffice to state a claim. Dkt. No. 1 ¶ 3.6; *see Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 785 (N.D. Cal. 2019) (denying motion to dismiss, finding plaintiffs plausibly alleged investment manager holding plan funds was ERISA fiduciary because "Plaintiffs sufficiently allege[d] that [manager] had control and discretion in setting its compensation, and that such compensation came out of the Plan's funds . . .").

Principal Life argues it only charged those amounts set forth in the 2021 Amendment, but the Court cannot rule on the precise contours of the contractual arrangement between the parties at this early stage of the case. *See infra.*, Sec. 3.3.2.

---

[1] At first, Principal Life argued in its motion that a service provider is not involved in plan management when negotiating its prospective fees, citing *Santomenno*, 883 F.3d at 838. *See* Dkt. No. 14 at 8–9. This is a correct statement of law. But the Board has since clarified in its opposition brief that its claims rest on the way Principal Life "paid itself," not any prior fee negations. *See* Dkt. Nos. 16 at 8 n.2; 18 at 2–3. Thus, the Court will not analyze fee negotiations an "action subject to complaint." *Santomenno,* 882 F.3d at 838.

1    The Board alleges other actions that make Principal Life a functional

2    fiduciary, but having found that the Board's factual allegations about Principal

3    Life's control and discretion over plan assets raise a right to relief above the

4    speculative level—that is, an ERISA claim that is plausible on its face—the Court

5    declines to analyze whether it has demonstrated a right to relief on alternative

6    grounds. *See Twombly*, 550 US at 556-557, 570; *In re Surescripts Antitrust Litig.*,

7    608 F. Supp. 3d 629, 640 (N.D. Ill. 2022) ("As long as a discernable legal theory

8    plausibly provides a remedy for a claim, a motion to dismiss that claim must be

9    denied, even if the complaint sets forth a host of alternative theories that fail.").

10   **3.3.   The Board has plausibly alleged a breach of contract claim.**

11       The Board alleges Principal Life violated the Master Services Agreement,

12   which Wells Fargo assigned to Principal Life. *See* Dkt. No. 1 ¶¶ 3.6; 4.6-4.10.

13   Principal Life moves to dismiss the Board's claim, arguing mostly that the Board

14   fails to "plausibly allege causation or damages."

15

16

17

18

19

20

21

22

23

### 3.3.1.   Choice of law.

The parties cite Washington law almost exclusively in support of their various arguments, but neither side squarely addresses which law applies to a dispute involving the contract. *See* Dkt. Nos. 1, 14. "A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 65 (2013). Washington courts generally enforce choice-of-law provisions "with certain exceptions." *McKee v. AT & T Corp.*, 191 P.3d 845, 851 (Wash. 2008). The Master Services Agreement contains a choice-of-law provision that states, "interpretation and effect of this Agreement shall be governed by the laws of the State of the Trustee's principal place of business." Dkt. No. 15 at 21. The Master Services Agreement defines the Board as "Trustee," and the complaint lists Alaska and Washington as the Board's "principal offices." Dkt. No. 1 ¶ 1.1. The complaint also alleges the "Trust" is domiciled in Washington state and maintains its principal place of business in King County, Washington." Dkt. No. 1 ¶ 1.1; ¶ 2.4(a). Based on this language, and because the parties apply Washington law in their briefing without objection, the Court will apply Washington contract law to this dispute. *See id*.

The Court addresses the question of breach and damages below.

### 3.3.2.   The Board has plausibly alleged Principal Life breached a contractual duty and damages.

Under Washington law, "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Lab. & Indus.*, 899 P.2d

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

6, 9 (Wash. Ct. App. 1995). Importantly, "[w]hether a party has breached a contract is a question of fact." *Frank Coluccio Const. Co. v. King Cnty.*, 150 P.3d 1147, 1153 (Wash. Ct. App. 2007).

The Board's complaint alleges Principal Life breached contractual duties arising from the Master Services Agreement. *See* Dkt. No. 1 ¶¶ 4.6-4.9; Dkt. No. 15 at 8-9 (Master Services Agreement Sec. I(D)(iv), (v), (vii)); 41 (*Trustee Acknowledgment*, Amendment to the Service Agreement Exhibits). Specifically, the Board alleges Principal Life breached the Master Service Agreement through the following conduct:

    a. Failure to timely deposit contributions into participant accounts;

    b. Failure to correctly deposit contributions into participant accounts;

    c. When contributions were corrected, failure to provide requested information regarding how the correction was made or funded;

    d. Failure to attend the Board of Trustee quarterly meetings or provide any reporting to the Trust Fund at its quarterly meetings;

    e. Failure to provide timely or substantive responses to the Trust's numerous questions and concerns;

    f. Inclusion of numerous inaccurate entries in participant on-line accounts;

    g. Significant distribution delays and inaccuracies; and

    h. Failure to provide information necessary for the Trust Fund to complete its required annual audits.

Dkt. No. 1 ¶ 3.14. Finally, the Board alleges "[a]s a result of Principal's breach, the Trust Fund incurred damages in an amount to be proven at trial." *Id*. ¶ 4.10.

Principal Life argues the Board's allegations fail to "plausibly allege causation or damages" and that the Board's damages allegations are conclusory and "plainly insufficient to state a claim under Rule 12(b)(6)." Dkt. No. 14 at 10. Not so.

To start, Principal Life's arguments about plausibility are inconsistent with the Board's actual pleading obligations. Principal Life says the Board "does not allege what . . . inaccuracies . . . caused any harm to the Trust Fund, or that they remain uncorrected." Dkt. No. 14 at 11. And Principal Life states the Board "does not identify . . . how Principal's responses were lacking" and "what information was lacking." *Id*. But under Rule 8, the Board need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 544). The Board's complaint is "more than an unadorned, [Principal]-harmed-me accusation": the complaint not only cites the Master Services Agreement as the instrument creating duties for Principal Life, but also cites to specific duties that it contends Principal Life breached thereby causing damages. *See* Dkt. No. 1 ¶¶ 4.6-4.10. In other words, the Board's breach of contract claim is sufficient because it provides a short and plain statement about an agreement, alleged breaches, and damages. *See* Dkt. No. 1 ¶¶ 4.1-4.10.

Second, Principal Life urges the Court to resolve factual discrepancies and assess the merits of the Board's case—forbidden endeavors on review of a Rule 12(b)(6) motion. "The motion to dismiss is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (cleaned up) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Next, Principal Life's arguments that the Board failed to sufficiently allege damages are really a call for a more precise accounting of damages, which is not required at this stage of the case. For example, Principal states the Board did not "plausibly allege . . . damages," does not "allege how there could be any damages for an issue it admits has already been corrected," and "has failed to allege any damages attributable" to alleged breaches. Dkt. No. 14 at 11. Washington law provides that "uncertainty as to the amount or quantum of damages is not to be regarded . . . as fatal to a litigant's right to recover damages." *Wenzler & Ward Plumbing & Heating Co. v. Sellen*, 330 P.2d 1068, 1070 (Wash. 1958). The Board pleaded—and the Court accepts as true on review of this motion—the fact of damages caused by Principal Life's breach of contract. Dkt. No. 1 ¶ 4.10. This is sufficient for the Board's breach of contract claim to survive Principal Life's motion to dismiss. Principal Life can learn more about the Board's loses, if any, through discovery.

Finally, in its motion and reply, Principal Life argues the Board cannot claim Principal Life violated the parties' "understanding and practice" for the purposes of its complaint and that the Court need not determine whether the Master Services Agreement is fully integrated. *See* Dkt. No. 14 at 4; Dkt. No. 18 at 7–8. Because the Court finds that the Board sufficiently pleaded a breach of the Master Service's Agreement's explicit terms and should not be dismissed, the Court declines to reach Principal Life's argument on this point. *See* Dkt. No. 1 ¶¶ 4.1-4.10.

ORDER ON MOTION TO DISMISS - 16

1

## 4.  CONCLUSION

In sum, the Court finds the Board has alleged sufficient facts, which must be taken as true at this early screening stage of the case, to establish its ERISA and breach of contract claims. Discovery and likely further motions practice will put the Board's claims to the test. Principal Life's motion to dismiss is DENIED. The parties' Stipulated Motion to Stay Case Deadlines Pending Ruling on Motion to Dismiss at Dkt. No. 14 is DENIED as moot.

Dated this 3rd day of November, 2023.

Jamal N. Whitehead
United States District Judge